**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

THE FERRARO LAW FIRM, P.A.,
a Florida professional association, and
TOTAL ASSET RECOVERY SERVICES
LLC, a Michigan limited liability company,

       Plaintiffs,

v.

HUDDLESTON CAPITAL PARTNERS VIII
LLC, a Delaware limited liability company,
TIMOTHY D. SCRANTOM, ESQ.,
SCRANTOM DULLES INTERNATIONAL
PLLC, a South Carolina professional limited
liability company, TEN STATE
INTERNATIONAL LAW, PLLC, a
South Carolina professional limited liability
company, KENNETH PLATT ELDER,
and G3 ANALYTICS LLC,

       Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, THE FERRARO LAW FIRM, P.A. ("Ferraro Firm"), a Florida professional

association, and TOTAL ASSET RECOVERY SERVICES LLC ("TARS"), a Michigan limited

liability company (collectively, "Plaintiffs"), by and through undersigned counsel, hereby bring

this action for damages against Defendants, HUDDLESTON CAPITAL PARTNERS VIII LLC

("Huddleston"), a Delaware limited liability company, TIMOTHY D. SCRANTOM, ESQ.

("Scrantom"), SCRANTOM DULLES INTERNATIONAL PLLC ("Scrantom Dulles"), a South

Carolina professional limited liability company, TEN STATE INTERNATIONAL LAW, PLLC

("Ten State"), a South Carolina professional limited liability company, G3 ANALYTICS LLC

("G3"), a Michigan limited liability company, and KENNETH PLATT ELDER ("Elder") (collectively, "Defendants"), and state as follows:

## NATURE OF THE ACTION

1.      This is Defendants' third attempt to interfere with the Ferraro Firm's relationship with longtime client, TARS, and usurp TARS's *qui tam* whistleblower litigation on behalf of the State of New York, after over a decade of work by the Ferraro Firm to unearth a multi-billion-dollar escheatment scheme, and on the heels of a tide-changing appellate victory allowing the case to finally proceed towards recovery.  *See Total Asset Recovery Services LLC, on behalf of the State of New York v. Metlife, Inc., et al.*, No. 2019-3806 (N.Y. Sup. Ct. Dec. 10, 2021) (reversing order of dismissal). (the "*Qui Tam* Action"),

2.      As alleged more specifically herein, and upon information and belief, Defendants used confidential and privileged information as consultants and legal counsel for TARS, respectively, as part of an ongoing scheme to take control over TARS and its assets, including the *Qui Tam* Action, and deprive the Ferraro Firm of its 40% contingent fee for legal services rendered to TARS in connection with the *Qui Tam* Action.

3.      In 2014, G3, led by Elder, hired a broker to procure a six-million-dollar ($6,000,000) litigation funding loan for the *Qui Tam* Action, and personally recommended Scrantom to TARS to represent G3 and TARS in the negotiation of the loan.  On November 21, 2014, G3 and TARS, as borrowers, entered into a Nonrecourse Loan and Security Agreement (the "Nonrecourse Loan"), with lender, Hamilton Capital VIII LLC ("Hamilton"), secured by a Promissory Note and certain other ancillary documents signed by TARS, G3, TARS's members, and Defendant Elder on behalf of G3 (collectively, the "Nonrecourse Loan Documents").

4.      On December 25, 2015, Scrantom and Elder (collectively, the "Interfering Plaintiffs") filed a frivolous arbitration demand, *Kenneth Platt Elder vs. The Ferraro Law Firm, P.A.*, Case No. 01-15-0006-0909 (the "First Interference Attempt"), in which they launched false and spurious claims against the Ferraro Firm of ethical violations, professional negligence, and breach of fiduciary duty in an effort to take over the ownership of the *Qui Tam* Action so that they could terminate the Ferraro Firm and recover its fee.

5.      In response, on February 17, 2017, the Ferraro Firm filed a tortious interference action in this Court against Defendants Scrantom, Elder, and their related entities based on Defendants' conduct in filing the First Interference Action (the "Florida Action").  *See The Ferraro Law Firm, P.A. vs. Timothy Scrantom, Esq., et al.*, No. 17-20640.

6.      On April 18, 2017, the Interfering Plaintiffs agreed to settle with the Ferraro Firm and dismiss the First Interference Action *with prejudice*, paying over $24,000 in costs to the Ferraro Firm for their frivolous conduct, and release the Ferraro Firm from any and all claims in the First Interference Action and the Florida Action.

7.      Unrelenting, on December 28, 2017, Defendants again attempted to interfere, suing TARS through another frivolous lawsuit, *G3 Analytics, LLC v. Total Asset Recovery Services, LLC, et al.*, No. 17-903-CK, in the State of Michigan First Circuit Court for the County of Hillsdale (the "Second Interference Action"), that was dismissed *with prejudice* shortly thereafter.

8.      On August 2, 2018, after the Interfering Plaintiffs were unsuccessful in both their First and Second Interference Actions, Defendant Huddleston Capital VIII LLC ("Huddleston") was formed with a name that is strikingly similar to lender Hamilton Capital VII LLC and which only the Interfering Plaintiffs could know because of the confidentiality provision in the Nonrecourse Loan Agreement preventing such disclosure.

9.      On or about 2017, TARS learned that the original lender, Hamilton, of the Nonrecourse Loan, that the Interfering Plaintiffs obtained, was controlled by a managing member, Platinum Partners Credit Opportunities Master Fund LP ("PPCO"), that was in receivership as a defendant in a civil enforcement action by the United States Securities and Exchange Commission, and whose founders were indicted for conspiracy, securities fraud, and investment advisor fraud. *See SEC v. Platinum Mgmt. (NY) LLC*, No. 16-CV-6848 (BMC) (E.D.N.Y.) (the "SEC Action").

10.     Although Hamilton and PPCO representatives assured TARS and the Ferraro Firm that the Nonrecourse Loan would not be tied up in the receivership, on or about September 2018, the Receiver in the SEC Action asked TARS for waiver of confidentiality to "market" the Nonrecourse Loan as an asset of PPCO.  TARS refused to waive the confidentiality provision and instead informed the Receiver that it was interested in purchasing the Nonrecourse Loan itself.

11.     On March 29, 2019, the Supreme Court of the State of New York for New York County entered an Order dismissing the Second Amended Complaint.  *Total Asset Recovery Services LLC, on behalf of the State of New York v. Metlife, Inc., et al.*, Index No. 115336/2010, Order, NYSCEF 147.

12.     On December 10, 2020, the First Department issued an Order reversing dismissal of TARS's Second Amended Complaint in the *Qui Tam* Action, enhancing the value of the Nonrecourse Loan by **billions** in allowing the case to finally proceed on the merits.  *Total Asset Recovery Services LLC, on behalf of the State of New York v. Metlife, Inc., et al.*, No. 2019-3806 (N.Y. Sup. Ct. Dec. 10, 2021).

13.     Only ***four days*** after the Ferraro Firm secured this victory on appeal, and without the opportunity to bid or notice to TARS or the Ferraro Firm, on December 14, 2020, the Nonrecourse Loan was sold as a "remnant asset" in the SEC Action for a **mere $13,100**.

14.     According to a partially executed and defective Assignment and Assumption Agreement ("Assignment") sent to TARS by Huddleston's counsel, Sterlington LLC ("Sterlington"), the Nonrecourse Loan was assigned to Defendant Huddleston by non-parties to the Nonrecourse Loan, RJ Funding, LLC and Platinum Partners Liquid Opportunities Master Fund, LP ("PPLO"), a different Platinum entity than PPCO, which held the Nonrecourse Loan as an asset in the SEC Action.  (*See* SEC Action, Receiver's Eighth Status Report to the Court, ECF 481-2) (TARS's "Litigation Finance Investment" appears as a PPCO asset). The purported Assignment either excludes or redacts the signature block for Huddleston, concealing the real party in interest.

15.     Huddleston's managing member, Acacia Trustees Limited ("Acacia"), is an offshore West Indies entity whose supposed principal, Kristina Phelan, executed a "Consent to Change Attorneys" as the "Sole Member and Manager of Total Asset Recovery Services LLC," while Huddleston's counsel, Mari Bonthuis's, Affirmation inconsistently states that Acacia is the "Sole Member of Huddleston."  (*See Qui Tam* Action, Consent to Change of Attorneys, Ex. 4 to Affirmation of Mari K. Bonthuis, NYSCEF Doc. No. 183 (March 12, 2021).)

16.     In the sworn statement, Kristina Phelan, on behalf of Acacia, acknowledges that she is signing the statement for use in the *Qui Tam* Action, but claims that she is located outside the United States and ***not*** "subject to the jurisdiction of the United States."  (*See id*.)

17.     Acacia's address in the West Indies is an offshore hub for shell entities connected to data found in the Panama Papers according to the International Consortium of Investigative Journalists Offshore Leaks Database, *available at* https://offshoreleaks.icij.org/nodes/14079740. Yet, the sworn statement was executed in Huddersfield, England.

18.     Defendant Scrantom markets himself as an expert in litigation finance and "offshore law."  Scrantom is based and has substantial connections to England, where the sworn

statement was executed.  Scrantom's marketed experience highlights that he has the know-how and relationships to plot and execute the corporate shell game at issue here.

19.     Through this facially defective Assignment and fraudulently procured "remnant asset" sale, Huddleston, through Sterlington, began sending demand letters to TARS and the Ferraro Firm, beginning on February 10, 2021 (the "Demand Letter"), claiming to be the lender of the Nonrecourse Loan and alleging "Events of Default" without any evidence or factual support. Certainly, a shell entity formed in 2018, has no personal knowledge of events of default supposedly backdating to 2016, which were never claimed by the lender, nor the Receiver *for over six years*.

20.     Huddleston makes a variety of subtle factual statements that would only be known by the parties involved in the *Qui Tam* Action and Nonrecourse Loan Documents over the last decade.  For example, in response to TARS's February 12, 2021 letter denying each alleged "event of Default," Huddleston claims that there was a waiver of the confidentiality provisions of the Nonrecourse Loan because the information became "public" based on the Florida Action and the Second Interference Action.  Even if one were to believe that Huddleston performed broad investigative searches for prior litigation, TARS is not party to the Florida Action and the Second Interference Action has no filings available online.  Upon information and belief, the Interfering Plaintiffs notified Huddleston of the existence of these actions.

21.     Notwithstanding the lack of support for its unfounded and hostile position, on March 12, 2021, Huddleston filed a motion to substitute counsel ("Motion for Substitution") in the *Qui Tam* Action, purporting to act as "attorney in fact" for TARS to gain control over the pending *Qui Tam* Action.  (*Qui Tam* Action, Motion to Substitute Counsel, NYSCEF 178 (March 12, 2021).)

22.     Huddleston's Motion for Substitution intends to portray the Ferraro Firm as unresponsive, misleading the Court by conveniently failing to include TARS's February 12, 2021 response to the Demand Letter or inform the Court that TARS disputes the alleged Events of Default.  Huddleston purports to act as TARS in asking the Court to substitute its own counsel, Sterlington, who has no False Claims Act expertise, no experience with the decade-long *qui tam* litigation, nor a relationship with the Attorney General in New York.

23.     What is more, Huddleston seeks to interfere with the *Qui Tam* Action by asking the Court to strike TARS's Third Amended Complaint.  (*See Qui Tam* Action, Motion to Substitute, NYSCEF 178.)   Why would an unrelated, would-be assignee that allegedly obtained an Assignment roughly three months ago and is not privy to the decade-long litigation or the data obtained during that litigation seek to file an amended complaint containing different factual allegations?  The only possible beneficiaries are the Interfering Plaintiffs with inside information and behind the scenes of the law firm that seeks to intervene and misappropriate the Ferraro Firm's contingency fee and the recently formed shell corporation it represents.

24.     As a result of Defendants' continued interference, the Ferraro Firm has had to investigate and respond to the frivolous Motion to Substitute and TARS has had to file an action for declaratory and injunctive relief to clarify its rights and declare non-default of the Nonrecourse Loan (the "Declaratory Judgment Action").

25.     These interferences must stop so that Plaintiffs can rightfully proceed with the *Qui Tam* Action on behalf of the State of New York.

## THE PARTIES

### A. Plaintiffs: Relator in the *Qui Tam* Action and its Counsel for Over Ten Years

26.     Plaintiff TARS is a limited liability company, organized and existing under the laws of the State of Michigan, with its headquarters and principal place of business located in Camden, Michigan.

27.     Plaintiff TARS was formed to act as a relator in *qui tam* actions seeking to recover unremitted life insurance proceeds on behalf of states under state false claim acts and is comprised of five members:

      a.    Gregory Lynam, an individual who is domiciled in Florida.

      b.    Scott Knott, an individual who is domiciled in Florida.

      c.    Thomas Prescott, an individual who is domiciled in Florida.

      d.    Steven Lynam, an individual who is domiciled in Ohio.

      e.    RZE Holdings LLC ("RZE Holdings") is a limited liability company, organized and existing under the laws of the State of Florida, with its headquarters and principal place of business located in the State of New York.  RZE Holdings' members are:

           i.    Edward McMahon, an individual who is domiciled in the State of New York; and

           ii.    The McMahon Family Trust in New York.

28.     Plaintiff, the Ferraro Firm, at all times material, was and is a Florida professional association, incorporated and existing under the laws of the State of Florida, with its principal place of business located at 600 Brickell Avenue, Suite 3800, Miami, Florida, 33131, and is otherwise a citizen of the State of Florida.

29.     On September 26, 2010, the Ferraro Firm entered into an Attorney's Contingency Fee Contract (the "Contingency Contract") in connection with the Ferraro Firm's representation of TARS as relator in life insurance escheatment whistleblower actions under the False Claim Acts of certain states.  (A true and correct copy of the Contingency Contract, as redacted to remove confidential and privileged information, is attached as **Exhibit "A"** hereto.)

**B.  Defendants: Shell, Offshore Entity, the Interfering Plaintiffs, and Related Entities**

30.     Defendant Huddleston is a limited liability company, organized and existing under the laws of the State of Delaware.

31.     Huddleston's managing member, Acacia, is a company organized and existing under the law of Nevis, West Indies.

32.     Defendant Scrantom, at all times material, is a natural person of full age of majority who is a citizen of the State of South Carolina, resides in Mt. Pleasant, South Carolina, and is otherwise *sui juris*.

33.     Scrantom Dulles, at all times material, was and is a professional limited liability company organized and existing under the laws of the District of Columbia, with its principal place of business located at 90 East Bay Street, Charleston, South Carolina.

34.     Upon information and belief, and at all times material, the constituent members of Scrantom Dulles were and are:

    a.   Defendant Timothy D. Scrantom, Esq.

       107 East Bay Street
       Charleston, South Carolina 29464

    b.   Frederick H. Dulles, Esq.

       90 East Bay Street
       Charleston, South Carolina 29401

35.     Upon further information and belief, both constituent members of Scrantom Dulles, at all times material, were and are citizens of the State of South Carolina, such that Scrantom Dulles is a citizen of the State of South Carolina.

36.     At all times material, Scrantom and his firm, Scrantom Dulles, marketed themselves as specializing in "offshore and international disputes," and litigation finance. Defendant Scrantom's newest company, Legis Finance Ltd., lists Neil Mitchell as a Senior Underwriting Advisor.  See Legis Finance, "Team," *available at* www.legisfinance.com/team. Mr. Mitchell was previously with the broker of Nonrecourse Loan, Fulbrook Capital Management, and worked closely with TARS and Hamilton on the negotiations.

37.     Upon information and belief, and at all times material, Scrantom is an officer, employee and/or agent of Scrantom Dulles.

38.     At all times material, Huddleston acted by and through its officers, directors, agents, employees, and/or independent contractors, including, but not limited to Scrantom, who at all times conducted themselves within the course and scope of their employment and/or agency relationships while engaging in the tortious acts and/or conduct described hereinafter.

39.     Defendant Ten State, at all times material, was and is a professional limited liability company organized and existing under the laws of the District of Columbia, with its principal place of business located at 107 East Bay Street, Charleston, South Carolina 29464.

40.     Upon information and belief, and at all times material, the sole constituent member of Defendant Ten State was and is Defendant Scrantom, 107 East Bay Street, Charleston, South Carolina 29464.

41.     Upon further information and belief, Defendant Scrantom, as the constituent member of Defendant Ten State, at all times material, was and is a citizen of the State of South Carolina.  As such, Ten State was and is a citizen of the State of South Carolina.

42.     At all times material, Defendant Ten State held itself out as a law firm specializing in offshore and international disputes, and litigation finance.

43.     Upon information and belief, and at all times material, Scrantom is an officer, employee and/or agent of Defendant Ten State.

44.     At all times material, Defendant Ten State acted by and through its officers, directors, agents, employees, and/or independent contractors, including, but not limited to Scrantom, who at all times conducted themselves within the course and scope of their employment and/or agency relationships while engaging in the tortious acts and/or conduct described hereinafter.

45.     Defendant Elder, at all times material, is a natural person of full age of majority who is a citizen of the State of Michigan, resides in Bloomfield Hills, Michigan, and is otherwise *sui juris*.

46.     Defendant G3 is a Michigan limited liability company whose sole member is Elder.

47.     G3 entered into a Consulting Agreement with TARS on August 20, 2010 (the "Consulting Agreement"), as amended, restated, supplemented or otherwise modified, including pursuant to the First Amendment to Consulting Agreement dated September 2, 2011 and the Second Amendment to Consulting Agreement dated October 4, 2014.  (A true and correct copy of the August 10, 2010 Consulting Agreement is attached as **Exhibit "B"** hereto.)

48.     The Consulting Agreement was provided as security for the Nonrecourse Loan by G3 to Hamilton under a Collateral Assignment of Consulting Agreement

## JURISDICTION AND VENUE

49.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Jurisdiction is proper because (1) the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs, and any attorney fees, and (2) there is complete diversity for purposes of this Court exercising subject-matter jurisdiction because the Plaintiffs and each individual Defendant and each constituent member of the unincorporated business Defendants are citizens of different states.

50.     Venue is proper in the United States District for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this Complaint occurred in Miami, Miami-Dade County, Florida, and Plaintiffs' principal place of business is located in Miami, Miami-Dade County, Florida.

## FACTUAL ALLEGATIONS

**A.  The Q1 Project: TARS and G3 Are Formed as Relators
in Potential Life Insurance Whistleblower Claims**

51.     On or about August 8, 2009, Gregory Lynam ("Lynam") formed and incorporated TARS as a Michigan limited liability company whose members are Lynam, Scott Knott, Thomas Prescott, Steven Lynam, and RZE Holdings.

52.     On or about On August 24, 2009, Defendant Elder formed and incorporated G3 as a Michigan limited liability company.  Defendant Elder is the President and Sole Member of G3.

53.     On or about August 2010, Elder proposed a business project he code-named the Q1 Project ("Q1 Project") to Lynam, in his capacity as a member of TARS.

54.     The Q1 Project was designed in part to help state governments identify life insurance companies that failed to escheat abandoned death benefits to the state when the beneficiary of the death benefit could not be located within a statutorily prescribed period of time.

55.     The Q1 Project involved investigating and ultimately filing and litigating life insurance escheatment *qui tam* whistleblower actions under the False Claim Acts of certain states against certain life insurance companies.

56.     Upon information and belief, Elder specifically requested that his name and/or involvement in the Q1 project remain anonymous because he had other unrelated ongoing business relationships with some of the same life insurance companies that would be the subject of any potential *qui tam* life insurance whistleblower claims.

57.     In exchange for and in consideration for his anonymity, Elder agreed to serve only as a consultant to TARS and further agreed that TARS would pursue the Q1 Project related *Qui Tam* life insurance whistleblower claims as the named relator.

58.     Accordingly, on August 20, 2010, Elder, by and through G3, entered into the Consulting Agreement with TARS for the purpose of pursuing the Q1 Project, as amended pursuant to the First Amendment to Consulting Agreement dated September 2, 2011 and the Second Amendment to Consulting Agreement dated October 4, 2014.  (*See* Ex. B.)

**B.  TARS Retains the Ferraro Firm to Pursue the *Qui Tam* Action in 2010**

59.     On September 26, 2010, TARS retained the Ferraro Firm to represent it in connection with the pursuit of certain life insurance escheatment whistleblower actions.

60.     The Contingency Contract states in Paragraph 1 as follows:

> 1.      Scope of Representation: *Client retains Attorney to represent Client only in connection with the pursuit of a Qui Tam Whistleblower action under the False Claim Acts of certain states… for allegations arising from a failure of life insurance companies to escheat unclaimed funds from life insurance policies to the respective states in violation of law.*

(*Id*. at ¶ 1.)

61.     The Contingency Contract was signed by Steven Lynam, as President of TARS, and by Jeffrey Sloman, Esq. and Russell Koonin, Esq., on behalf of the Ferraro Firm.  (*Id*. at 6.)

62.     Pursuant to the terms of the Contingency Contract, TARS is bound and obligated to pay the Ferraro Firm "an attorney's fee of forty-percent (40%) of the gross amount of any settlement, judgment or recovery" for its legal services and 5% for appellate fees. (*Id*. at ¶ 6.)

## C.  The *Qui Tam* Action

63.     On December 3, 2010, the Ferraro Firm, on behalf of TARS, filed a Complaint in the *Qui Tam* Action under seal and notified the New York Office of the Attorney General ("OAG") of the fraud that certain life insurance companies were perpetrating on New York.

64.     Over the next seven years, the Ferraro Firm and TARS spent hundreds of hours working with the OAG, attending multiple meetings in New York, assisting with the issuance of subpoenas, Section 308 letters, and reviewing and analyzing a massive amount of documents and data provided in response.

65.     Until December 2017, the case remained under seal pursuant to the OAG's requests for more time to investigate.  During this time, TARS and the Ferraro Firm worked closely with the OAG to identify data deficiencies, send additional subpoenas *duces tecum*, and to sort, analyze, and interpret the data provided by the defendant-insurance companies.

66.     At the beginning of 2017, the Ferraro Firm and TARS met with the OAG and requested that the OAG make a final decision to intervene or allow the Ferraro Firm to unseal and litigate the case.  Shortly thereafter, the OAG informed TARS that it was planning not to intervene at that time, but that, given the years of collaboration, the OAG was confident in the Ferraro Firm's capacity to litigate the case on behalf of the State.

67.     On October 11, 2017, the OAG notified the Court in the *Qui Tam* Action of its decision to not supersede or intervene.

68.     Although TARS and the Ferraro Firm were intimately involved in the OAG's investigations, TARS had no discretion to unseal or litigate until the OAG notified the court of its decision not to intervene.

69.     On November 16, 2017, the Ferraro Firm moved to file the Second Amended Complaint and unseal the *Qui Tam* Action, which the Court granted on December 1, 2017.

70.     After extensive briefing and oral argument, the Supreme Court of the State of New York for New York County entered an order dismissing TARS's Second Amended Complaint on March 29, 2019.  (*Qui Tam* Action, Order, NYSCEF 147.)

71.     TARS appealed and on December 10, 2020, the First Department issued an order reversing dismissal.  *Total Asset Recovery Services LLC, on behalf of the State of New York v. Metlife, Inc., et al.*, No. 2019-3806 (N.Y. Sup. Ct. Dec. 10, 2021).

72.     For almost eleven years, the Ferraro Firm has competently and diligently represented TARS in the *Qui Tam* Action, which remains pending and finally at issue.

73.     Yet, just four days after the Ferraro Firm's appellate victory on behalf of TARS, TARS's Nonrecourse Loan was purportedly sold for $13,100 as a "remnant asset," according to a partially executed Assignment and Assumption Agreement dated December 14, 2020 ("Assignment") and provided by counsel for Huddleston to TARS on February 18, 2021.

### D.  Elder Leads Efforts to Procure Litigation Funding Loan and Hires Scrantom

74.     In 2014, having invested several years and substantial resources to investigate the life insurance defendants' fraudulent practices, G3, through Elder, engaged a broker, Fulbrook

Capital Management, LLC ("Fulbrook"), to facilitate financing opportunities that would enable G3, as a consultant, and TARS, as relator, to continue to pursue the *Qui Tam* Action.

75.     Elder vouched for the expertise of Scrantom as a litigation finance attorney and urged TARS to hire Scrantom to represent TARS alongside G3 in the negotiation of the Nonrecourse Loan with Hamilton.

76.     In September 2014, a litigation finance lender, Hamilton, provided TARS with a Term Sheet setting forth the business terms pursuant to which it was willing to make a nonrecourse loan to TARS.

77.     On November 21, 2014, TARS and G3, as borrowers, entered into the Nonrecourse Loan Agreement with Hamilton.

78.     Scrantom was subsequently retained as General Counsel for all of Elder's companies, including, but not limited to, G3.

79.     As set forth above, the *Qui Tam* Action was under seal when the Nonrecourse Loan was funded and remained sealed until December 1, 2017.  During this time, TARS continued to assist the OAG in its investigation, but there were no substantive court filings, discovery, nor any litigation occurring.

80.     After closing on the Nonrecourse Loan, Messrs. Elder, Scrantom, and Lynam participated on numerous calls with Hamilton representatives to provide updates regarding the *Qui Tam* Action.  Messrs. Elder, Scrantom, and Lynam also collaborated to prepare and submit reports to Hamilton.

E. **First Interference Action: the Florida Arbitration**

81.    On December 25, 2015, the Interfering Plaintiffs filed a frivolous demand for arbitration before the (Ret.) Honorable Ronald C. Dresnick in the American Arbitration Association.

82.    Scrantom was the architect of a scheme devised to collude with Elder in a concerted effort to deprive the Ferraro Firm of its 40% contingent fee for legal services rendered to TARS in connection with the *Qui Tam* Action.

83.    Beginning on or about December 25, 2015, and continuing through the filing of this Complaint, Defendants have tortiously interfered with the ongoing attorney-client relationship between the Ferraro Firm and TARS.

84.    Scrantom filed the First Interference Attempt as lead counsel for Elder, alleging specious and unfounded claims of ethical violations, professional negligence and breach of fiduciary duty all designed to result in a termination of the attorney-client relationship between the Ferraro Firm and TARS.

85.    The Interfering Plaintiffs' objective in filing the arbitration in the First Interference Attempt was to take over the ownership of the *Qui Tam* Action so that they could terminate the Ferraro Firm.

86.    TARS does not and has never had any interest in terminating its attorney-client relationship with the Ferraro Firm.

87.    On February 17, 2017, the Ferraro Firm filed the Florida Action against Defendants Scrantom, Elder, and their related entities in the case styled *The Ferraro Law Firm, P.A. vs. Timothy Scrantom, Esq., et al.*, No. 17-20640.

88.     On April 18, 2017, the Interfering Plaintiffs entered into a Settlement Agreement with the Ferraro Firm, agreeing to dismiss the First Interference Action, with prejudice, pay over $24,000 in costs to the Ferraro Firm for their frivolous conduct, and release the Ferraro Firm from any and all claims in the First Interference Action and the Florida Action.

**F.   Second Interference Action: the Michigan Case**

89.     Undeterred, on December 28, 2017, Elder filed another frivolous claim on behalf of G3 against TARS in the State of Michigan First Circuit Court for the County of Hillsdale.

90.     Elder attempted to relitigate the issues presented and settled in the First Interference Action by suing TARS directly.

91.     On May 9, 2018, the court in the Second Interference Action effectively dismissed the case as to all defendants.

**G.   Interference by Scrantom and Elder through a Shell, Offshore Entity**

92.     Upon information and belief, the Interfering Plaintiffs devised a new scheme to take over TARS's interest in the *Qui Tam* Action by purchasing the Nonrecourse Loan Documents in receivership.

93.     Roughly three months after the Second Interference Action was dismissed, on or about August 2, 2018, Huddleston was incorporated in Delaware with a very similar name to Hamilton, the original lender under the Nonrecourse Loan Documents, who only parties to the Nonrecourse Loan would be aware of.

94.     One month later, on September 2018, the Receiver in the SEC Action reached out to TARS requesting a waiver of confidentiality to market the Nonrecourse Loan.

95.     TARS explicitly refused to waive the confidentiality provision and informed the Receiver that it was interested on purchasing the Nonrecourse Loan.

96.     Upon information and belief, the Interfering Plaintiffs established the Huddleston entity for the specific purpose of pursuing the purchase of the Nonrecourse Loan from the Receiver.

97.     Upon information and belief, the Interfering Plaintiffs personally or indirectly through their shell entity and/or associates reached out to the Receiver to inquire about the Nonrecourse Loan Documents and triggered the Receiver's request for a waiver.

### H.  Multi-Million Dollar Nonrecourse Loan, Secured by Multi-Billion Dollar *Qui Tam* Action, is Sold to Shell Entity as a "Remnant Asset" for $13,100

98.     Armed with insider information about the multi-year litigation, confidential and privileged attorney-client information, and the crucial status of the *Qui Tam* Action on appeal, Defendants misled the Receiver into believing the Nonrecourse Loan is a "remnant" asset.

99.     In August 2019, unbeknownst to TARS and in violation of the confidentiality provision of the Nonrecourse Loan, the Nonrecourse Loan was marketed for sale to certain investors known to bid on remnant assets. (*See* SEC Action, Receiver's Fourteenth Status Report to the Court, ECF 561, at ¶ 3) (the Nonrecourse Loan was marketed and as one of many "assets with limited value pursuant to a remnant sale process.")

100.    Huddleston claims to have obtained an assignment of the Nonrecourse Loan from the Receiver on December 14, 2020 for a meager $13,100.  However, Huddleston has failed to provide TARS with any evidence of an executed assignment from Hamilton to Huddleston.

### I.  Defendants Claim Unfounded Events of Alleged Default to Trigger Power of Attorney and Fire the Ferraro Firm

101.    Nonetheless, on February 10, 2021, in its first letter to TARS's rightful members and Ferraro Law, Huddleston advanced frivolous claims that a series of alleged events of default

had occurred pursuant to which Huddleston was exercising rights to take control of TARS as its "attorney in fact" under the Nonrecourse Loan.

102.    Huddleston expected TARS's founding members to walk away from the company they founded over a decade before without stating any factual basis whatsoever for its claimed events of default nor producing evidence that it obtained a valid assignment from Hamilton.

103.    Upon information and belief, Huddleston's hostile approach to seize control of TARS is the latest iteration of the Interfering Plaintiffs' tortious interference scheme.

104.    On February 12, 2021, TARS responded to Huddleston and unequivocally denied that any event of default had occurred.

105.    On February 18, 2021, Huddleston replied to TARS claiming the events of default occurred without, once again, providing any explanation or factual support, attaching the defective Assignment.

106.    Upon information and belief, Huddleston does not possess a valid assignment of the Nonrecourse Loan.

107.    Upon information and belief, Huddleston redacted the signature block from the purported Assignment because it was executed by or on behalf of the Interfering Plaintiffs.

108.    Notwithstanding the lack of support for its position, on March 12, 2021, Huddleston filed the Motion for Substitution in the *Qui Tam* Action, seeking not only to replace the Ferraro Firm, but also to interfere with TARS's *Qui Tam* Action by asking the Court to strike the Third Amended Complaint.  (*See Qui Tam* Action, Motion to Substitute, NYSCEF 178.)

109.    What is more, the Motion for Substitution misled the Court by omitting TARS's response to the Demand Letter and failing to inform the Court that TARS disputed the alleged Events of Default.

110. This tortious interference by Defendants has inhibited the ability of the Ferraro Firm to represent TARS in the *Qui Tam* Action and in other *qui tam* matters because the Ferraro Firm has had to dedicate a significant amount of time and resources to defend itself in the various frivolous claims brought by Defendants.

111. Accordingly, Defendants' tortious conduct is ongoing and continuing in nature.

112. As a result of the frivolous litigation that was commenced by Defendants, the Ferraro Firm has sustained monetary damages in the form of legal expenses and costs to defend itself from these baseless claims that are a direct and proximate result of Defendants' tortious conduct. Said damages are permanent and continuing in nature due to the Interfering Plaintiffs ongoing tortious interference.

113. All conditions precedent to the bringing of this action have been performed, have occurred or have been waived.

114. As a result of the matters hereinafter described, Plaintiffs were required to retain the undersigned to represent it in this matter and has bound and obligated itself to pay the firm a reasonable fee for its services, separate and apart from the damages the Ferraro Firm, has already sustained in defending itself from the frivolous allegations stemming from the various interference attempts described herein.

## CAUSES OF ACTION

## COUNT I

## CLAIM OF TORTIOUS INTERFERENCE WITH A CONTRACTUAL BUSINESS RELATIONSHIP AGAINST DEFENDANT TIMOTHY D. SCRANTOM, ESQ.

115. Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 114 above, and further alleges the following:

116.     At all times material, the Ferraro Firm and TARS had and have an attorney-client relationship that is clearly evidenced by the Ferraro Firm's Contingency Contract with TARS, Ex. A, along with the Ferraro Firm's existing representation of TARS in connection with TARS's *Qui Tam* Action.

117.     Scrantom had knowledge of the Ferraro Firm and TARS's attorney-client relationship in connection with TARS's *Qui Tam* Action

118.     Scrantom intentionally and unjustifiably interfered with the Ferraro Firm and TARS's attorney-client relationship in an intentional and deliberate attempt to terminate the Contingency Contract TARS has with the Ferraro Firm and to deprive the Ferraro Firm of its contingent fee for legal services rendered to TARS in connection with TARS's life insurance escheatment *Qui Tam* Action.

119.     As a direct and proximate result of Scrantom's tortious conduct described above, Plaintiffs have suffered and continues to suffer damages, including without limitation, legal services plus costs for its resolution of the frivolous Motion for Substitution in the *Qui Tam* Action and prosecution of the Declaratory Judgment Action, attorneys' fees and costs in prosecuting the instant matter, as well as the prospective loss of its contingent fee for legal services rendered to TARS in connection with TARS's *Qui Tam* Action, and its ability to properly represent TARS in the *Qui Tam* Action.

120.     These losses are either permanent or continuing in nature and Plaintiffs will suffer the losses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant, TIMOTHY D. SCRANTOM, ESQ., in excess of Seventy-Five Thousand Dollars ($75,000.00) plus costs, interest

and for such other and further relief both at law and in equity to which Plaintiffs may show to be justly entitled.

## COUNT II
## TORTIOUS INTERFERENCE WITH A CONTRACTUAL BUSINESS RELATIONSHIP AGAINST DEFENDANT SCRANTOM DULLES INTERNATIONAL PLLC

121.    Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 114 above, and further allege the following:

122.    At all times material, the Ferraro Firm and TARS had and have an attorney-client business relationship that is clearly evidenced by the Ferraro Firm's Contingency Contract with TARS, Ex. A, along with Ferraro Law's existing representation of TARS in connection with TARS's *Qui Tam* Action.

123.    Defendant Scrantom Dulles, at all times material, acting by and through its officers, directors, agents, servants, employees and/or independent contractors, including, but not limited to Mr. Scrantom, had knowledge of the Ferraro Firm's attorney-client relationship in connection with TARS's life insurance escheatment *Qui Tam* Action.

124.    Defendant Scrantom Dulles, directly and/or acting through its officers, employees, agents, apparent agents and/or those over whom it exercised control including, but not limited to, Mr. Scrantom, intentionally and unjustifiably interfered with the Ferraro Firm and TARS's attorney-client relationship in an intentional and deliberate attempt to terminate the Contingency Contract TARS has with the Ferraro Firm and to deprive the Ferraro Firm of its contingent fee for legal services rendered to TARS in connection with TARS's *Qui Tam* Action.

125.    As a direct and proximate result of Defendant Scrantom Dulles's tortious conduct described above, Plaintiffs have suffered and continue to suffer damages, including without limitation, legal services plus costs for its defense in the frivolous First and Second Interference

Actions, the Motion for Substitution in the *Qui Tam* Action, and attorney's fees and costs in prosecuting the instant matter and the Declaratory Judgment Action, as well as the prospective loss of the Ferraro Firm's contingent fee for legal services rendered to TARS in connection with TARS's *Qui Tam* Action, its ability to properly represent TARS in the *Qui Tam* Action, and TARS's ultimate recovery as relator in the *Qui Tam* Action and other pending whistleblower actions.  The losses are either permanent or continuing in nature and Plaintiffs will suffer the losses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant, SCRANTOM DULLES INTERNATIONAL, PLLC, a South Carolina professional limited liability company, in excess of Seventy-Five Thousand Dollars ($75,000.00) plus costs, interest and for such other and further relief both at law and in equity to which Plaintiffs may show to be justly entitled.

## COUNT III

### CLAIM OF TORTIOUS INTERFERENCE WITH A CONTRACTUAL BUSINESS RELATIONSHIP AGAINST DEFENDANT TEN STATE

126.    Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 114 above, and further alleges the following:

127.    At all times material, the Ferraro Firm and TARS had and have an attorney-client business relationship that is clearly evidenced by the Ferraro Firm's Contingency Contract with TARS, along with the Ferraro Firm's existing representation of TARS in connection with TARS's *Qui Tam* Action.

128.    Defendant Ten State, at all times material, acting by and through its officers, directors, agents, servants, employees and/or independent contractors, including, but not limited to Mr. Scrantom, had knowledge of the Ferraro Firm and TARS's attorney-client relationship in connection with TARS's life insurance escheatment *Qui Tam* whistleblower action.

129.    Defendant Ten State, directly and/or acting through its officers, employees, agents, apparent agents, and/or those over whom it exercised control including, but not limited to, Mr. Scrantom, intentionally and unjustifiably interfered with the Ferraro Firm and TARS's attorney-client relationship in an intentional and deliberate attempt to terminate the Contingency Contract TARS has with the Ferraro Firm and to deprive the Ferraro Firm of its contingent fee for legal services rendered to TARS in connection with TARS's life insurance escheatment *Qui Tam* whistleblower action.

130.    As a direct and proximate result of Defendant Ten State's tortious conduct described above, Plaintiffs have suffered and continue to suffer damages, including without limitation, legal services plus costs for its defense in the frivolous First and Second Interference Actions, the Motion for Substitution in the *Qui Tam* Action, and attorney's fees and costs in prosecuting the instant matter and the Declaratory Judgment Action, as well as the prospective loss of the Ferraro Firm's contingent fee for legal services rendered to TARS in connection with TARS's *Qui Tam* Action, its ability to properly represent TARS in the *Qui Tam* Action, and TARS's ultimate recovery as relator in the *Qui Tam* Action and other pending whistleblower actions.  The losses are either permanent or continuing in nature and Plaintiffs will suffer the losses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant, TEN STATE INTERNATIONAL LAW, PLLC, a South Carolina professional limited liability company, in excess of Seventy-Five Thousand Dollars ($75,000.00) plus costs, interest and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## COUNT IV

### CLAIM OF TORTIOUS INTERFERENCE WITH A CONTRACTUAL BUSINESS RELATIONSHIP AGAINST DEFENDANT KENNETH PLATT ELDER

131. Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 114 above, and further alleges the following:

132. At all times material, the Ferraro Firm and TARS had and have an attorney-client relationship that is clearly evidenced by the Ferraro Firm's Contingency Contract with TARS, along with the Ferraro Firm's existing representation of TARS in connection with TARS's *Qui Tam* Action.

133. Defendant Elder had knowledge of the Ferraro Firm and TARS's attorney-client relationship in connection with TARS's *Qui Tam* Action.

134. Defendant Elder intentionally and unjustifiably interfered with the Ferraro Firm and TARS's attorney-client relationship in an intentional and deliberate attempt to terminate the Contingency Contract TARS has with the Ferraro Firm and to deprive the Ferraro Firm of its contingent fee for legal services rendered to TARS in connection with TARS's *Qui Tam* Action.

135. As a direct and proximate result of Elder's tortious conduct described above, the Plaintiffs have suffered and continue to suffer damages, including without limitation, legal services plus costs for its defense in the frivolous First and Second Interference Actions, the Motion for Substitution in the *Qui Tam* Action, and attorney's fees and costs in prosecuting the instant matter and the Declaratory Judgment Action, as well as the prospective loss of the Ferraro Firm's contingent fee for legal services rendered to TARS in connection with TARS's *Qui Tam* Action, its ability to properly represent TARS in the *Qui Tam* Action, and TARS's ultimate recovery as relator in the *Qui Tam* Action and other pending whistleblower actions. The losses are either permanent or continuing in nature and Plaintiffs will suffer the losses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant, KENNETH PLATT ELDER, in excess of Seventy-Five Thousand Dollars ($75,000.00) plus costs, interest and for such other and further relief both at law and in equity to which Plaintiffs may show to be justly entitled.

### DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury of all issues triable as a matter of right by a jury.

DATED this 22nd day of March, 2021.              Respectfully submitted,

*/s/ James L. Ferraro*
James L. Ferraro, Esq.
Florida Bar No.: 381659
jlf@ferrarolaw.com
Dick M. Ortega, Esq.
Florida Bar No.: 113054
dmo@ferrarolaw.com
Natalia Salas, Esq.
Florida Bar No. 44895
nms@ferrarolaw.com
Mathew Gutierrez, Esq.
Florida Bar No. 94014
mdg@ferrarolaw.com

**THE FERRARO LAW FIRM, P.A.**
Brickell World Plaza
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

*Attorneys for Plaintiffs*